**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

| | |
|---|---|
| NICOLA SARNELLI, derivatively on behalf of FIRSTENERGY CORPORATION, <br><br>             Plaintiff, <br><br>     v. <br><br> MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, STEVEN E. STRAH, K. JON TAYLOR, ROBERT REFFNER, MICHAEL J. DOWLING, EBONY YEBOAH-AMANKWAH, and JAMES PEARSON. <br><br>             Defendants, <br>     and <br><br> FIRSTENERGY CORPORATION, <br><br>             Nominal Defendant. | Case No. 2:20-cv-5192 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Nicola Sarnelli ("Plaintiff"), by and through the undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant FirstEnergy Corporation ("FirstEnergy" or the "Company") against members of its Board of Directors (the "Board" or "Director Defendants") and executive officers (the "Officer Defendants," and together with the Board the "Defendants") seeking to remedy the Individual Defendants' misconduct alleged herein. Plaintiff makes the allegations within this Complaint based upon his personal knowledge as to himself and with respect to the remainder of

the allegations, based upon discussions with and on the reliance of their counsel, including the pre-suit investigation conducted by counsel, which included the Company's filings with the U.S. Securities and Exchange Commission ("SEC"), filings in legal and governmental actions, conference calls, announcements, press releases, corporate governance documents available on the Company's website, government and regulatory investigations, and other information.

## **INTRODUCTION**

1.      This is a stockholder derivative action brought by Plaintiff on behalf of FirstEnergy that seeks to remedy wrongdoing committed Defendants.  Plaintiff is, and was at all times relevant hereto, a FirstEnergy stockholder whose interests align with all other stockholders throughout the relevant period.

2.      Defendants engaged in a scheme to buy legislation to bail out the Company's nuclear facilities.  Defendants participated in and sanctioned a corporate environment that resulted in over a nearly three-year period, funneling over $60 million to Ohio government officials including the Ohio House Speaker Larry Householder ("Householder") and lobbyists.

3.      In exchange for these elicit funds, FirstEnergy successfully gained passage of Ohio House Bill 6 ("HB6"), which provided a $1.3 billion ratepayer-funded bailout to keep the Company's failing nuclear facilities in operation

4.      On July 21, 2020, the FBI arrested Ohio House Speaker Larry Householder and four other persons, including a FirstEnergy lobbyist for racketeering and bribery.  Local prosecutors dubbed the arrest as the "largest bribery, money-laundering scheme" in Ohio history.

5.      On this news, FirstEnergy stock price closed at $27.09 on July 22, 2020, $14.00 per share lower than the closing price of $41.26 on July 20, 2020 prior to the news.

6.      In addition to the loss of market capitalization and reputational harm, numerous class action lawsuits have been filed against the Company by stockholders and rate payers.

7.      Through this Action, Plaintiff seeks redress for the harm caused by Defendants to FirstEnergy and its stockholders.

## JURISDICTION

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and FirstEnergy maintains its corporate headquarters in this District.

## THE PARTIES

*Plaintiff*

12.     Plaintiff Nicola Sarnelli is a citizen of New Jersey who owns 1,000 shares of FirstEnergy stock, was a stockholder at the time of the misconduct was disclosed and has been a stockholder of FirstEnergy continuously since that time.

*Director Defendants*

13.     Defendant Michael J. Anderson ("Anderson") has been a director of FirstEnergy since 2007 and serves on the Board's Audit and Finance Committees.  Anderson is a citizen of Ohio.

14.     Defendant Steven J. Demetriou ("Demetriou") has been a Director of FirstEnergy since 2017 and serves on the Finance, Operations, Safety and Nuclear Oversight Committees. Demetriou is a citizen of Virginia.

15.     Defendant Julia L. Johnson ("Johnson") has been a Director of FirstEnergy since 2011 and serves on the Corporate Governance and Corporate Responsibility and Finance Committees.  Johnson is a citizen of Florida.

16.     Defendant Charles E. Jones ("Jones") has been President, CEO, and a director of FirstEnergy since 2015.  Jones is a citizen of Ohio.

17.     Defendant Donald T. Misheff ("Misheff") has been non-executive Chairman of the FirstEnergy since May 2018 and Director of FirstEnergy since 2012. He serves on the Audit and Corporate Governance and Corporate Responsibility Committees.  Misheff is a citizen of Ohio.

18.     Defendant Thomas N. Mitchell ("Mitchell") has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees.  Mitchell is a citizen of Florida.

19.     Defendant James F. O'Neil, III ("O'Neil") has been a Director of FirstEnergy since 2017 and serves on the Compensation, Operations, and Safety and Nuclear Oversight Committees. O'Neil is a citizen of Texas.

20. Defendant Christopher D. Pappas ("Pappas") has been a Director of FirstEnergy since 2011 and serves on the Compensation and Finance Committees. Pappas is a citizen of Pennsylvania.

21. Defendant Sandra Pianalto ("Pianalto") has been a Director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees. Pianalto is a citizen of Ohio.

22. Defendant Luis A. Reyes ("Reyes") has been a Director of FirstEnergy since 2013. Reyes serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees. Reyes is a citizen of Georgia.

23. Defendant Leslie M. Turner ("Turner") has been a Director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees. Turner is a citizen of Pennsylvania.

24. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner are referred to collectively as the "Director Defendants" or the "Board."

*The Officer Defendants*

25. Defendant Steve E. Strah ("Strah") is President of FirstEnergy. He previously served as FirstEnergy's CFO from March 2018 and as Senior Vice President of FirstEnergy's Utilities Operations since 2015. Strah is a citizen of Ohio.

26. Defendant James F. Pearson ("Pearson") served as CFO of FirstEnergy until March 2018 and as FirstEnergy Vice President of Finance from March 2018 through April 2019. Pearson is a citizen of Ohio.

27. Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Defendant Strah. Prior to assuming this position, he was the Company's Controller and Chief

Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations. Taylor is a citizen of Ohio.

28.     Defendant Robert Reffner ("Reffner") has been Senior Vice President and Chief Legal Officer of FirstEnergy since May of 2020, previously serving as senior vice president and general counsel since 2018 and vice president of legal since 2007. Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing. Reffner is a citizen of Ohio.

29.     Defendant Michael Dowling ("Dowling") has been Senior Vice President, External Affairs of FirstEnergy since 2011. Dowling has been with FirstEnergy since 1986. Dowling is responsible for FirstEnergy's local, state and federal Governmental Affairs; Energy Policy; State Regulatory Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement, and the FirstEnergy Political Action Committee. Dowling is a citizen of Ohio.

30.     Defendant Ebony Yeboah-Amankwah ("Yeboah-Amankwah") has been Vice President, General Counsel and Chief Ethics Officer of FirstEnergy since 2020, previously serving as vice president, deputy general counsel, corporate secretary and chief ethics officer since 2018, and vice president, State and Federal Regulatory Legal Affairs since 2017. She joined the Company in 2005. Yeboah-Amankwah is a citizen of Ohio.

31.     Defendants Dowling, Jones, Pearson Reffner, Strah, Taylor and Yeboah-Amankwah are referred to collectively as the "Officer Defendants."

***Nominal Defendant***

32.     Nominal Defendant FirstEnergy is an Ohio corporation headquartered in Akron. FirstEnergy is an electric utility company with subsidiaries and affiliates involved in the

distribution, transmission, and generation of electricity, as well as energy management and other energy-related services. FirstEnergy's ten electric utility operating companies comprise one of the U.S.'s largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey, and New York. FirstEnergy stock trades on the New York Stock Exchange under the ticker "FE."

## FACTUAL ALLEGATIONS

33. FirstEnergy provides power to Ohio residents. In 1999 an Ohio law was passed to allow for competition in Ohio's electricity market, however, FirstEnergy has used its size and influence to compel utility customers to guarantee its position as Ohio's power provider.

34. FirstEnergy owned and operated two nuclear power plants in Ohio: the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station through subsidiaries.

35. Inspectors at the Davis-Besse plant discovered an acid leak that closed the plant for extensive repairs from 2002 to 2004. FirstEnergy was fined $28 million for misleading regulators regarding the damage.

36. Maintenance costs continued to rise for the Company as the nuclear facilities aged at the same time energy prices decreased as did demand resulting in hundreds of millions of dollars in losses.

37. In 2018 one of the FirstEnergy subsidiaries filed for bankruptcy. The bankruptcy court held that FirstEnergy would still bear responsibility for environmental cleanup costs.

38. The Company assured investors it was pursuing a legislative "fix" to the problems surrounding their nuclear facilities. For example, during FirstEnergy's fourth-quarter 2016 earnings conference call, Jones told investors:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with
> legislators on solutions that can help ensure Ohio's future energy security. Our top

priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.

We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [FirstEnergy] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far, and we will keep you posted as this process unfolds.

39.     However, passage of the Zero-Emissions Nuclear Resource Program ("ZEN")

failed to gain legislative approval.

40.     Undeterred, the Defendants sought to gain legislative approval though more illicit

means.

41.     In the Company's 2016 Annual Report, filed with the SEC on February 21, 2017

("2016 10-K"), FirstEnergy reported a weak energy market, poor forecast demands, and hundreds

of millions of dollars in losses, particularly from its nuclear energy affiliate. FirstEnergy stated it

intended to pursue "legislative or regulatory solutions" to address the problem. Jones echoed this

message during the annual earnings investor call on February 22, 2017, touting "legislative or

regulatory initiatives for [nuclear power] generation that recognize its environmental or energy

security benefits."

42.     Over the next two-and-a-half years, FirstEnergy engaged in a scheme to funnel tens

of millions of dollars to state lawmakers, spread misinformation, and illicitly impede a ballot

initiative. Jones and other Officer Defendants were directly involved in and oversaw the scheme.

43.     Householder was the former speaker of the Ohio house of representatives, who after

a 15-year break, won back his old seat in 2016.

44.     In January 2017, Householder met with FirstEnergy representatives on FirstEnergy's private jet.  At or about the time of this trip FirstEnergy executives struck a deal with Householder: in exchange for funneling him millions of dollars needed to support his bid to regain his speakership, he would promise to secure the passage of legislation that would bail out the Company's nuclear power plants to the tune of $1.3 billion.

45.     In February 2017, Generation Now, Inc. and Energy Pass-Through, nonprofit entities with the purposed purpose of "social welfare," were created.  In reality, these 501(c)(4) organizations were vehicles to funnel money from FirstEnergy to Householder and his affiliates.

46.     In March 2017, Householder began receiving quarterly $250,000 payments from FirstEnergy into Generation Now's bank account.  These payments increased over time.

47.     Householder and FirstEnergy used these funds to support Householder and control the campaigns of over 20 Ohio state legislature candidates.  These candidates in turn supported Householder's bid to regain his role as Speaker.  With these votes Householder regained his role as Speaker, providing him with the power to push through FirstEnergy's legislative agenda.

48.     FirstEnergy's dirty money was also used to buy a Florida vacation home for Householder and used to settle a personal lawsuit against Householder.

49.     HB6 was introduced just three-months after Householder's election as Speaker. Interestingly, Householder was not a sponsor or co-sponsor of the proposed law, likely in an effort to assuage any notions that he was the force behind the bill and that connected to FirstEnergy.

50.     The proposed law would prevent the shutdown of FirstEnergy's Ohio nuclear plants, which had been hemorrhaging money for years, through a $9.00 per megawatt hour subsidy to "clean" energy generation.  This subsidy was to be borne on the state's taxpayers through monthly charge on all residents' energy bills.  FirstEnergy's nuclear subsidiaries were projected

to collected payments worth $160 million annually (almost 95% of the funds collected from ratepayers).

51.     After the HB6 was introduced on the floor of the Ohio house, FirstEnergy began increasing its payments into Generation Now.  On April 30, 2019, roughly two weeks after introduction of HB6, FirstEnergy wired $1.5 million to Generation Now and in May 2019, wired four additional payments totaling $8 million.

52.     With the wheels fully greased, Householder went to work stumping votes to obtain the passage of HB6.

53.     FirstEnergy funded, Householder controlled, "nonprofit" organizations funded a $10 million media campaign of misdirection and misinformation to provide cover for the purchased legislators to vote in favor of the bill.

54.     Householder used his power and influence to whip the votes needed to have HB6 passed into law.

55.     On May 29, 2019, HB6 passed the House.  On July 17, 2019, HB6 passed the Ohio Senate and was thereafter signed into law by the Governor.

56.     FirstEnergy was involved each step of the way.  Jones and Householder remained in constant contact with at least 30 calls logged between the two in the six-months following Householder's January 2019 appointment as Speaker.  All told, Jones and Householder logged at least 84 calls between February 2017, when the dirty non-profits were created, and July 2020, when the arrest of Householder and his co-conspirators went public.  During that same time Householder held 14 phone calls with FirstEnergy's Vice President of External Affairs (Dowling), and 188 phone calls with FirstEnergy's Ohio Director of State Affairs.[1]

---

[1] The identity of this executive is unknown as the FirstEnergy website does not identify an

57. During this same time in multiple public filings Defendants told investors the Company was "actively involved" in obtaining "legislative solutions."

58. The new law was to become effective on October 22, 2019.

59. After the bill was signed into law but prior to the effective date, Ohioans Against Corporate Bailouts initiated a state-wide ballot initiative referendum to overturn the legislation. Ohio law required 265,774 signatures within 90-days to block the implementation of HB6.

60. FirstEnergy was not prepared to have their legislative victory stimmed by a ballot initiative. Between July 24 and October 22, 2019, FirstEnergy paid over $38 million to quash the ballot initiative blanketing the media with ads and mailers opposing the initiative, and generally enriching the personal interests of Householder and his co-conspirators to maintain their support in this fight.

61. This ad campaign was designed to frighten residents by falsely claiming that China was using the petition drive to invade Ohio's energy grid. The ads claimed that by signing the petition you would be passing along your name, email, cell phone and address to the Chinese Government.

62. FirstEnergy hired the top signature collecting firms to do nothing in order to create a conflict so they could not collect signatures for the proposed referendum.

63. Worse still, the funds were used to directly bribe signature collectors.

64. Householder co-conspirator, lobbyist and former chairman of the Ohio Republican Party, Matt Borges personally sought out information from a person working for the referendum

---

executive with this title. Yeboah-Amankwah previously served as the executive director of State Affairs. Based on her biography on the Company website it appears her role within the Company may have had oversight for such an employee.

committee.  He paid the individual $15,000 and threatened to "blow up" his house if word of the payment got out.  The individual was an FBI informant.

65.     FirstEnergy's subsidiary also filed a lawsuit claiming that HB6 is a tax and thus not eligible to be repealed by ballot initiative.

66.     The ballot initiative failed and HB6 was made effective.

67.     FirstEnergy ultimately paid over $60 million to Householder and his co-conspirators, including Householder's top aide Jeff Longstreth, and lobbyists Neil Clark, Matt Borges and Juan Cespedes.  In a 2019 recorded conversation, Clark said "Generation Now is the Speaker's (c)(4)," and FirstEnergy's "deep pockets," and the money was "unlimited."  Borges described FirstEnergy's payments as "Monopoly money."  And a co-consirator was recorded saying: "'[O]n HB 6 [FirstEnergy] got $1.3 billion in subsidies, free payments . . . so what do they care about putting in $20 million a year for this thing, they don't give a sh*t.'"

68.     On March 1, 2020, when the Company was likely on notice of the government investigations regarding the Company's role in the scheme to have HB6 enacted, Jones exercised an option to sell 407,466.991 shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of $18,091,534.40.

69.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release announcing the corruption and racketeering charges lodged against Householder and his co-conspirators.  A criminal complaint with supporting affidavits was also filed the same day.

70.     FirstEnergy was also served with subpoenas in connection with the government's investigation – which could lead to criminal charges against FirstEnergy employees.

71. FirstEnergy stock prices plummeted on this news, falling to a low of just $22.85 per share on July 22, 2020, nearly 45% below the stock's closing price on July 20, 2020, of $41.26 per share, on high trading volume.

72. Stockholders and ratepayers immediately sought relief filing various lawsuits against FirstEnergy, lawsuits that personally name many of the Defendants in this action.

73. In addition, Ohio's governor has announced he supports a repeal of HB6 and is requiring FirstEnergy to open its financial books to prove it needs funding in connection with its nuclear facilities.

74. The lawsuits, responses to subpoenas and fallout from the potential repeal of HB6 and quest to seek new legislation in its stead have and till continue to cause the Company financial and reputational harm.

## DEFENDANTS' DUTIES

75. By reason of their positions as officers, directors, and fiduciaries of FirstEnergy and because of their ability to control the business and corporate affairs of FirstEnergy and its subsidiaries, the Defendants owed FirstEnergy and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage FirstEnergy in a fair, just, honest, and equitable manner.

76. The Defendants were and are required to act in furtherance of the best interests of FirstEnergy and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to FirstEnergy and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

77.    Defendants also had a duty to ensure their public filings contained accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.    FirstEnergy's corporate documents also expressly detail the Board's duties, including FirstEnergy's Code of Business Conduct ("Code"). The Code applies to all FirstEnergy employees, including the Officer Defendants. The Code recognizes that "[n]o single book or code of conduct policy can provide answers to every situation. This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section." FirstEnergy's Policy 101 handbook explaining the Code explicitly states:

> It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct, and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations, and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.
>
>                               \*\*\*
>
> "Maintaining high ethical standards builds trust with customers, stockholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."

\*\*\*

Fair Dealing - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform, or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, Code of Business Conduct 6 honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor.

\*\*\*

We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes. Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. If you become aware of theft, waste or misuse of Company assets or funds or have any questions about your proper use of them, you should speak immediately with your supervisor or the Chief Ethics Officer or through the Employee Concerns Line.

\*\*\*

Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

79.     In addition, the Board of Directors has a Code of Ethics and Business Conduct that the Director Defendants are is required to follow ("Director's Code").[2] The Director's Code requires:

---

[2] The Director's Code was revised on September 15, 2020 but was otherwise in effect at all times

Directors shall protect the Company's assets from loss, theft, carelessness, misuse and waste.  Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes.

\*\*\*

Directors shall comply, and oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws.

\*\*\*

Directors shall deal fairly with and oversee fair dealing by employees and officers with the Company's customers, suppliers, competitors and employees.  Directors shall not take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or through any other unfair-dealing practice.

\*\*\*

Directors shall proactively promote ethical behavior and take steps to ensure the Company: (a) encourages employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourages employees to report violations of laws, rules, regulations or the Company's Code of Business Conduct to appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith.

\*\*\*

Directors shall communicate any potential or suspected violations of laws, rules, regulations and this Code promptly to the Chairman of the Board, Chief Executive Officer, Chief Ethics Officer, or Chair of the Corporate Governance and Corporate Responsibility Committee.  Violations will be investigated by the Board or by a person or persons designated by the Board and prompt, appropriate and consistent action will be taken in the event of any violations of the Code.

80.     The members of the Audit Committee are governed by the Company's Audit Committee Charter.  Under the Audit Committee Charter, Defendants Anderson, Misheff, Pinalto, and Turner are charged with oversight responsibilities, including meeting with "members of management to review adherence to applicable federal, state, and local laws and corporate policies

---

relevant to this action.

and review processes relating to training, monitoring and reporting of policy compliance," communicating to the "Board any issues with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements…" and "regularly [reporting] to the Board concerning its activities."

81.     Finally, the members of the Corporate Governance and Corporate Responsibility Committee ("Governance Committee") – Defendants Johnson, Misheff, Mitchell, and Reyes – were charged with oversight in connection with political contributions.   Specifically the Governance Committee has:

> We have decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.

82.     Defendants' actions in connection with the passage of HB6 involve knowing and culpable violations of Defendants' obligations as directors and officers of FirstEnergy, including the absence of good faith and a reckless disregard for their duties to the Company and its stockholders.

83.     At all times relevant hereto, Defendants were the agents of each other and of FirstEnergy and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had access to adverse, non-public information about the Company.

85.     Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by FirstEnergy.

86.     Defendants' actions constituted a breach of their fiduciary duties, the Director's Code and/or the Code.  The actions of the members of the Audit Committee were also a breach of their duties pursuant to the Audit Committee Charter.  The members of the Governance Committee similarly violated their duties as members of that Committee.

## DEMAND ON THE BOARD WOULD BE FUTILE

87.     Plaintiff brings this action derivatively in the right and for the benefit of FirstEnergy to correct the breaches of fiduciary duty by the Individual Defendants.

88.     Plaintiff will adequately and fairly represent the interests of FirstEnergy and its stockholders in enforcing and prosecuting this type of action and has no claims or economic position antagonistic to the other stockholders.

89.     Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act because the Director Defendants would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in FirstEnergy's improper misconduct.

90.     A majority of the 11-member Board served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Director Defendants knew or should have known of the wrongdoing but failed to act in the face of a known duty.

91.     Nine out of eleven of the Director Defendants (Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, and Reyes) were on the Board at the time FirstEnergy began bribing Householder and his co-conspirators in 2017.  And the two remaining directors, Pianalto and Turner joined the Board in 2018 when the Company was increasing its periodic payments to Householder and his co-conspirators.

92.     In addition, Defendants Anderson, Misheff, Pinalto, and Turner had heightened duties pursuant to the Audit Committee Charter and failed to comply with their mandated duties of oversight and compliance with the law.

93.     For these reasons, each Director Defendant faces a substantial likelihood of liability for their participation in the illicit acts.  The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties.

94.     It is implausible that the Director Defendants were wholly unaware of $60 million being funneled out of the Company.  Given the duties placed on the Director Defendants, to the extent any of the Director Defendants did not have actual knowledge of scheme to bribe government official and lobbyists to obtain a ratepayer funded bailout for the Company's nuclear facilities, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith of their duties.

95.     In addition, those seven members of the Board affirmatively chose to recommend, in connection with a stockholder proposal in the Company's 2017 proxy, that stockholders vote against the proposal requesting transparency and accountability on lobbying policies and payments.  This proposal would have required disclosure of the wrongdoing at issue. Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes recommended stockholders vote against similar proposals in 2015 and 2016 as well.

96.     Defendants' conduct resulted in the Company suffering reputational harm and is likely to incur millions of dollars in damages in connection with stockholder and ratepayer lawsuits, and legal fees in connection with defending such lawsuits and any government investigations.

97.     In light of the foregoing actions, a majority of the Director Defendants lost their independence and/or lack the ability to bring a disinterested business judgment to bear if demand had been made relative to the Company's illicit scheme to buy legislation that provides over a billion dollars to FirstEnergy from its own ratepayers.

## COUNT I

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act

98.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

100.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

101.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

102.     Under the direction and watch of the Director Defendants, the Company's SEC filings, including its annual Proxy Statements and quarterly reports failed to disclose the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering these filings false and misleading.

103.     Defendant Jones and Pearson signed the Company's 2016 10-K that misleadingly stated FirstEnergy would be exploring "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits" And with respect to FirstEnergy's nuclear subsidiary, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory solution."

104.     On February 22, 2017, Jones, Pearson and Taylor held an earnings call and again mislead investors regarding the "legislative solutions" being sought by the Company. Defendants Jones and Pearson also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

105.     On April 27, 2017, July 27, 2017 and October 26, 2017, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2017, June 30, 2017 and September 30, 2017, respectively, which were signed by Defendant Taylor which all misleadingly stated that the Company was "exploring legislative or regulatory solutions" in connection with the Company's nuclear business.

106.     Defendants Jones, Pearson and Taylor signed the Company's annual report on Form 10-K for the fiscal year ended December 31, 2017 ("2017 10-K") which again misleadingly

told investors FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits."

107.    On February 21, 2018, Jones, Pearson and Taylor held an earnings call during which Jones told investors FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities. He stated that its nuclear subsidary would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

108.    On April 23, 2018, July 31, 2018 and October 25, 2018, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2018, June 30, 2018 and September 30, 2018, respectively, which were signed by Taylor and Strah and told investors the Company was complying with all laws and policies.

109.    Defendants Jones and Strah signed the Company's annual report on Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K") wherein the Company claimed to be following all applicable laws and policies but omitted the existence of the Company's bribes to government officials.

110.    On February 20, 2019, Jones and Strah held an earnings call during which Jones told investors that:

> if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input. But it's too early in the process for me to talk about what that might mean.

111. On April 23, 2020 FirstEnergy filed with the SEC its quarterly report on Form 10-Q for the quarter ending March 31, 2019, which was signed by Jones and Strah and continued to omit the existence of the bribery scheme while claiming the Company was complying with all applicable rules and laws.

112. All of the SEC filing also represented that the Company's nuclear subsidiary "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." They also included certifications from the signatories that stated that "the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud."

113. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the foregoing SEC filings were materially false and misleading. The misrepresentations and omissions were material to the Company's stockholders in voting on matters set forth for stockholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, ratification of the Company's independent auditor, and whether or not to approve the stockholder proposal requiring an annual report on lobbying policies and payments.

101. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Jones, Pearson, Taylor and Strah

102.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Company securities, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

103.    Each of these control persons have been named as defendants in the securities fraud class action.

104.    Defendants Jones, Pearson, Taylor and Strah each signed the false and misleading SEC filings as alleged supra.

## COUNT III

### Breach of Fiduciary Duty Against the Director Defendants

101.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101.    Each Director Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

102.    Each of the Director Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

103.    By virtue of their positions as directors of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Director Defendants have, and at all

relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Director Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its stockholders and not his or her own. Director Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

104. The Director Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws. Once that system is in place, the Director Defendants have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. The Director Defendants have acted in violation of FirstEnergy's internal policies, including the Directors' Code. In addition, the members of the Audit Committee breached their charter as did the members of the Governance Committee.

105. The Company's corporate governance guidelines also require Director Defendants to review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

106. The Director Defendants breached their fiduciary duties through self-dealing and/or by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy involving bribery.

107. Based on the foregoing conduct, the Director Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

108.    As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

109.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT IV

### Breach of Fiduciary Duty Against the Officer Defendants

102.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

110.    Each Officer Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

111.    Each of the Officer Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

112.    By virtue of their positions as officers of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Officer Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.  Each Officer Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its stockholders and not his or her own.

113.    Additionally, the Officer Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws.  Once that system is in place, the Officer Directors have a duty to address and/or report to the Board any

indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. The Officer Defendants have acted in violation of FirstEnergy's internal policies, including, the Code.

114. The Company's corporate governance guidelines also require the Officer Defendants to review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

115. The Officer Defendants breached their fiduciary duties through self-dealing and/or by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy involving bribery.

116. Based on the foregoing conduct, the Officer Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

117. As a direct and proximate result of the Officer Defendants' conscious failure to perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

118. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

## COUNT V

### Unjust Enrichment Against All Defendants

119. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

120. By their wrongful acts, violations of law, and false and misleading statements and omissions of material facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FirstEnergy.

121.    The Defendants either benefitted financially from their improper conduct and their making of lucrative insider sales or received unjustly lucrative bonuses tied to their false and misleading statements, or received bonuses, stock options, or received compensation that was unjust in light of the Defendants' bad faith conduct.

122.    Plaintiff, as a stockholder and a representative of FirstEnergy, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits – including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation – obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

### COUNT VI

**Against All Defendants for Aiding and Abetting**

123.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.    Each of the Defendants acted and is acting with knowledge of or with disregard to the fact that the Defendants are in breach of their fiduciary duties to FirstEnergy and have participated in a conspiracy in breach of fiduciary duties.

125.    In committing the wrongful acts alleged herein, each of the Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

126.    The Defendants collectively and individually initiated a course of conduct that was designed to and did violate the federal securities laws, authorize corporate actions to serve their

own personal interests rather than the interests of the Company and its shareholders, misrepresent material facts about the Company, its financial condition and business prospects, prevent the disclosure of material information necessary to make statements complete and accurate, and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

127.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

128.    Each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

129.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and in furtherance of the wrongdoing.

## <u>COUNT VII</u>

### **Insider Trading Against Defendant Jones**

130.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.    At the time that Defendant Jones sold his FirstEnergy common stock by reason of his high executive and directorial positions with the Company, Jones had access to highly material information regarding the Company.  As a participant in the scheme with Householder and his co-conspirators and by virtue of the fact that he was identified in the civil and criminal complaints

against Householder and his co-conspirators, Jones would have had prior knowledge that the government was conducting an investigation.

132. On March 1, 2020, Jones exercised an option to sell 407,466.991 shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of $18,091,534.40.

133. At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of FirstEnergy shares at that time.

134. Jones had knowledge of material, adverse non-public information and sold his FirstEnergy common stock in reliance on that information and thereby breached his fiduciary duties to the Company and must disgorge all profits from such insider selling.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law and demand on the Board is excused;

B. Awarding against all Individual Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

C. Awarding to FirstEnergy restitution from the Individual Defendants, and ordering disgorgement of all unjust profits, benefits, and other compensation obtained by Individual Defendants;

D. Ordering FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal processes to comply with the Company's governance

obligations, and all applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events contained in this Complaint;

E. Awarding to Plaintiff the cost and disbursements of the action, including reasonable attorney's fees, experts' fees, accountant fees, costs, and expenses; and

F. Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims asserted herein.

Dated: October 2, 2020          Respectfully Submitted,

*/s/ Pamela A. Borgess*
Pamela Borgess (0072789)
BORGESS LAW, LLC
6800 W. Central Ave. Ste. E
Toledo, OH 43617
(567) 455-5955
pborgess@borgesslaw.com

GARDY & NOTIS, LLP
James S. Notis
Meagan Farmer
126 East 56th Street, 8th Floor
New York, NY 10022
(212) 905-0509
jnotis@gardylaw.com
mfarner@gardylaw.com
*(Subject to Pro Hac Vice Admission)*

*Counsel for Plaintiff Nicola Sarnelli*